**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SM, A MINOR, BY REBECCA MACK, GUARDIAN, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | Case No.: |
| v. | ) ) | |
| RIPLEIGHS LLC, AND LAURA MARING, | ) ) ) | |
| *Defendants*. | ) ) ) | |

**COMPLAINT IN CIVIL ACTION**

Plaintiff, SM, a Minor, by Rebecca Mack, Guardian, through the undersigned counsel, now files this Complaint in Civil Action and avers the following:

**PARTIES**

1.      Plaintiff, SM, a Minor, ("SM") brings this action through her guardian Rebecca Mack ("Ms. Mack") (collectively, SM and Ms. Mack are referred to as "Plaintiff").  Ms. Mack is an adult individual who resides in Fairfield, Pennsylvania.

2.      Defendant, Ripleighs LLC ("RPL") is a domestic limited liability company that maintains a registered office at 200 S. 4th Street, McSherrystown, Pennsylvania 17344.

3.      Defendant, Laura Maring ("Ms. Maring") (collectively, RPL and Ms. Maring are identified as "Defendants"), is the owner and operator of RPL and can be reached at 200 S. 4th Street, McSherrystown, Pennsylvania 17334.

4.      Ms. Maring is pursued in her personal capacity pursuant to Plaintiff's claims arising under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. (the "PHRA") and specifically pursuant to 43 P.S. § 955(e).

5.     Defendants maintain a storefront for their operations located at 502 East Main Street, Emmitsburg, Maryland 21272 (the "Store").

## JURISDICTION

**A.     This Court Possesses Subject Matter Jurisdiction Over This Matter.**

6.     This Court possesses subject matter jurisdiction over this matter ("Federal Question Jurisdiction"), because Plaintiff is advancing causes of action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") (the "Federal Law Claims"). 42 U.S.C. §2000e *et seq*.

7.     Plaintiff is also advancing claims under the PHRA, 43 P.S. § 951, *et seq*. (the "State Law Claims").

8.     This Court may exercise supplemental jurisdiction over the State Law Claims because the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.  28 U.S.C. § 1367(a).

**B.     This Court is the Proper Venue for This Matter.**

9.     RPL is deemed to reside in the Middle District of Pennsylvania, because its principal place of business is located there, thus establishing contacts sufficient to subject it to the personal jurisdiction of this district. 87 U.S.C. § 1391(d).

10.     The Middle District of Pennsylvania is the proper venue with respect to RPL because it resides in this district.  *Id*. at § 1391(b)(1).

11.     The Middle District of Pennsylvania is the proper venue with respect to Ms. Maring because she "is subject to the court's personal jurisdiction with respect to such action." 87 U.S.C. § 1391(b)(3).

2

**C.     This Court Possesses Personal Jurisdiction Over All Defendants in This Matter.**

12.     Federal district courts may exercise general personal jurisdiction over corporate defendants in a state where they are "fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

13.     A corporate defendant is at home in the states where they are incorporated or maintain their principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

14.     A corporation incorporated in Pennsylvania is a domestic business corporation. 15 Pa.C.S. § 102(a).

15.     This court may exercise general personal jurisdiction over RPL, because it is incorporated in Pennsylvania, and thus is "fairly regarded as at home" in Pennsylvania. *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 924.

16.     Federal district courts find personal jurisdiction over individual defendants to the extent authorized by the law of the state in which service is effectuated. Fed. R. Civ. Pro. 4(k)(1)(A).

17.     Pennsylvania's Long-Arm statute provides that a tribunal may exercise personal jurisdiction where an individual or entity is "transacting any business in this Commonwealth." Pa. C.S. § 5322.

18.     "[T]ransacting any business" is defined to mean:

> (i) The doing by an person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an act.
> (iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.

*Id.*

3

19.    Further, Pennsylvania's Long-Arm statute provides for personal jurisdiction over persons:

> (10) committing any violation within the jurisdiction of this Commonwealth of any statute, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or any order of court or other government unit."

*Id.*

20.    In the instant matter personal jurisdiction can be found over Ms. Maring under Pennsylvania's Long-Arm statute for the following reasons:

    a.    In maintaining a corporation, its operations, and its employees in the Commonwealth of Pennsylvania she engages in a series of acts for the purpose of realizing a pecuniary benefit. Pa.C.S. § 5322(a)(1)(i).

    b.    In maintaining a corporation, its operations, and its employees in the Commonwealth of Pennsylvania she engages in a business. Pa.C.S. § 5322(a)(1)(iv).

    c.    She committed a violation of the PHRA within the jurisdiction of the Commonwealth of Pennsylvania. Pa.C.S. § 5322(a)(10).

21.    This Court's exercise of personal jurisdiction by and through Pennsylvania's Long-Arm Statute comports with the Due Process Clause of the Constitution through the "specific jurisdiction" that exists over Ms. Maring as the causes of action complained herein arise specifically from Defendants' contacts with the forum. U.S. Const. amend XIV, § 1.

22.    Specific Jurisdiction exists if (1) a defendant "purposefully directed activities at the forum" *O'Connor v. Sandy Lane Hotel Co.,* 496 F.3d 312, 317 (3d Cir. 2007) quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); (2) the instant litigation must "arise out of or relate to at least one of those activities." *Id.* quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,*

466 U.S. 408, 414 (1984); and (3) the exercise of jurisdiction must "comport with fair play and substantial justice." *Id.* quoting *Burger King*, 471 U.S. at 476.

23.     Ms. Maring has engaged in business operations for pecuniary gain within this forum and these operations were at all time relevant hereto, intentionally effectuated.

24.     As more thoroughly delineated below, Plaintiff participated in these business operations, through an employment relationship, and correspondingly the Federal Law Claim and the State Law Claims arise from said relationship.

25.     Thus, this Court may properly exercise personal jurisdiction over Ms. Maring based on her conduct through Pennsylvania's Long-Arm Statute.

**FACTUAL BACKGROUND**

26.     SM was born in 2009 and was sixteen years old at the start of her employment with RPL.

27.     By way of further background, SM is a committed member of the Catholic community and has been homeschooled her entire life.

28.     In August 2025, RPL hired SM for the upcoming season as an ice cream associate. In this role, SM reported to the Store where she was assigned fifteen hours of work per week.

29.     At the outset of her hiring, Defendants assigned SM to work alongside a sixteen-year-old boy (identified herein as "SF").

30.     In September 2025, SF learned that SM was an ardent believer of the Catholic faith and was educated at home.  Following this knowledge, SF began sexually harassing and antagonizing SM.

31.     In October 2025, SF began telling SM comments such as, "*I'm going to find out where you live*" in a menacing way that put SM in fear for her physical safety.

32.    The subsequent weekend, SF approached SM at the Store and stated, "*I know where you sleep.  I'll set your bed on fire.*"

33.    On October 17, 2025, SF and SM were assigned to work together in RPL's food truck.

34.    At 7:34 p.m., an anonymous number sent SM a text message which stated, "*Im [sic] going to kiss you on your lips when I find you.*"

35.    SM was deeply disturbed by this sinister comment that threatened sexual assault.

36.    SM sent a text message in response to the individual requesting them to identify themselves.

37.    The anonymous number refused to do so.

38.    At this time, SF observed SM's reaction from another area within the food truck, acted unaware of the sexually harassing text messages SM was receiving, and continued to act as though he was simply using his cell phone.

39.    After several minutes, SM began to suspect it was SF and asked him if he was the instigator of the sexually harassing text messages.

40.    SF eventually admitted that the anonymous number was his "*new number.*"

41.    SM asked SF why he threatened to assault her and he stated, "*no boy has ever spoken to [her] like that,*" that he "*wanted a reaction,*" and wanted to "*prepare [her] for the real world.*"

42.    After this encounter, SF saw how shaken SM was at his inappropriate conduct.

43.    In response, he began asking SM repeatedly if she wanted a hug.

44.    SM was disgusted and explicitly rejected his advances telling him, in no uncertain terms, that she was not interested in physical contact with him.

45.     At the end of her shift, SM was leaving the premises and SF wrapped his arms around her despite her lack of consent.

46.     After SM returned home visibly upset, she showed her parents the text messages; explained that SF had admitted to sending the sexual text messages from an intentionally anonymized number; had made the above disturbing comments at work throughout the course of her employment; and had physically grabbed her earlier that evening at the conclusion of her shift.

47.     One of SM's older siblings called the number to verify that it belonged to SF and confirmed his identity once he answered.

48.     Shortly thereafter, SF sent additional text messages from the same number falsely alleging that people were calling him and "*threatening him*" and that he would "*get Laura [Ms. Maring] involved.*"

49.     In response, Ms. Mack identified herself, instructed SF to stop texting SM, and advised him that his actions constituted sexual harassment at the workplace.

50.     Later that evening, at 10:58 p.m., SF sent Ms. Maring a text message wherein he admitted that "*someone*" sent SM, "*a message that isnt [sic] very appropriate.*"

51.     On October 18, 2025, at 8:02 a.m., Ms. Maring responded and shared SF's message with SF and SM in a group text message.

52.     Specifically, Ms. Maring referenced SF's message from the night before and stated, "*Good Morning!  Not sure what this is about, but is this going to cause an issue at work?*"

53.     SF attempted to minimize his involvement in his subsequent responses and blanketly provided RPL with the answer it wanted; that SM being victimized would not interfere with Store operations.

54. RPL took this answer as definitive less than one minute later, unilaterally concluded its duty to investigate without hearing from SM, and stated, "*Great! I'm not a fan of drama*."

55. After this message, Ms. Maring made no attempt to contact SM to investigate what had occurred.

56. Further, Ms. Maring did not reach out to SM to ensure she was comfortable returning to the work environment.

57. Approximately 75 minutes later, at 9:15 a.m., SM saw that Ms. Maring was not going to reach out to her individually.

58. This was despite the fact that Ms. Maring was readily available evidenced by Ms. Maring's immediate text messages exchanged with SF.

59. Correspondingly, at this time, SM sent Ms. Maring a text message directly and confirmed the appropriate email for Ms. Mack to file SM's report of sexual harassment.

60. Ms. Maring replied with a single flat response of "*sure*" confirming that "info@ripleighs.com" was the correct email address.

61. At 9:54 a.m., Ms. Mack sent Ms. Maring an email with her and SM's report of sexual harassment.

62. Within it, Ms. Mack explicitly outlined SF's ongoing sexual harassment of SM.

63. Ms. Mack identified the specific instances of harassment; that SM "*just want[ed] to work*," and specifically that SF was antagonizing SM so that she was "*prepared for the 'real world*.'"

64. Further, Ms. Mack offered a convenient solution to bring the sexual harassment to a close and requested that RPL no longer schedule SF alongside SM.

65.     At 12:12 p.m., Ms. Maring responded.  Instead of addressing Ms. Mack's clear report of sexual harassment, Ms. Maring offensively stated, "*I expect boys and girls to be able to work together and not let hormones get in the way*."

66.     Ms. Maring then stated she spoke with SF for his information and sent SM a text message for additional information.

67.     The text message in question from Ms. Maring to SM consisted of two sentences that lacked any appreciation for the severity of the situation.

68.     Specifically, Ms. Maring stated, "*Can u [sic] send me a screen shot of the texts w/ [sic] the time stamp and number it came from pls [sic]. I'm getting two different stories*."

69.     In the course of the subsequent text messages between Ms. Maring and SM, she continued her bias against SM and concluded the conversation with another blame-shifting statement of, "*I expect you and [SF] to be able to work together and not let hormones get in the way...*"

70.     At 12:35 p.m., Ms. Mack responded to Ms. Maring's email and reiterated that SF sexually harassed SM.

71.     Specifically, Ms. Mack stated that, "*What he said to her is considered sexual harassment, which is illegal under state and federal law*," and identified for Ms. Maring that she was disregarding the "*safety and wellbeing of [her] employees*" in favor of Ms. Maring's financial interests.

72.     Ms. Mack further reiterated the standard an employer is held to under state and federal law and that, "*She [SM] should feel confident that her employer will protect her from sexual harassment in the workplace to the best of their ability*."

9

73. At 2:05 p.m., RPL and Ms. Maring responded and stated, "*At this point, effective immediately it's in my best interest to avoid further conflict with you by having SM not work for us any longer.*"

74. Ms. Maring emphasized her retaliatory animus and stated that SM's termination "*had to do with the inappropriate things that her mother said to her employer.*"

## COUNT I
## RETALIATION IN VIOLATION OF TITLE VII AND THE PHRA
### 42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.*

75. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

76. It is illegal for an employer to discriminate against an employee because the employee opposed a practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).

77. To establish a claim for retaliation, Plaintiff must show (1) they engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002)).

A. **Plaintiff Engaged in Protected Activities.**

78. An employee engages in a protected activity by complaining to their employer concerning conduct prohibited by Title VII. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792 (3d Cir. 2016).

79. On October 18, 2025, Plaintiff submitted a written report to Defendants that identified several instances of sexual harassment.

80. Accordingly, Plaintiff engaged in protected activities in satisfaction of her *prima facie* burden.

10

**B.    Plaintiff Was Subjected to an Adverse Employment Action After Her Protected Activities.**

81.    On October 18, 2025, approximately two hours after Plaintiff submitted her report of sexual harassment, Defendants terminated Plaintiff.

**C.    A Causal Connection Between Plaintiff's Protected Activities and the Adverse Actions Readily Exist.**

82.    On October 18, 2025, at 2:05 p.m., Defendants admitted to their retaliatory animus and stated it was in Defendants' "*best interest*" to terminate Plaintiff to "*avoid further conflict*".

83.    The "*further conflict*" Defendants referred to was Plaintiff's protected activities and her report of sexual harassment.

84.    A plaintiff can establish their protected activity was a "but-for cause of the alleged adverse action by the employer" by and through temporal proximity that is "unusually suggestive of retaliatory motive."   *Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 142-143 (3d Cir. 2019) (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338m 362 (2013); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017)).

85.    Given the close temporal proximity that exists from Plaintiff's report of sexual harassment to the time she was terminated, a sustainable inference of retaliation arises.

86.    As a direct and proximate result of Defendants' conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost front and back pay and corresponding benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

87.    WHEREFORE, Plaintiff, SM, a minor, By Rebecca Mack, Guardian, seeks the damages set forth in the *ad damnum* clause of this Complaint in Civil Action, *infra*.

## COUNT II
### DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PHRA
### 42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.*

88.     An employer may not discriminate against an employee based on the employee's sex.  42 U.S.C. § 2000e-2(a)(1).

89.     To establish a *prima facie* case of sex discrimination, a plaintiff must show that (1) they are a member of a protected class; (2) they were qualified for the position they sought to attain or retain; (3) they suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Veverka v. Human Services Center*, 2023 U.S. Dist. LEXIS 44424, 2023 WL 2500370 at *10 (W.D. Pa. March 14, 2010).

**A.     Plaintiff is a Member of a Protected Class.**

90.     As averred above, Plaintiff was born female and is therefore a member of a protected class.

**B.     Plaintiff Was Qualified for Her Role and an Adverse Employment Action Was Taken Against Her.**

91.     Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her position.

92.     Specifically, Plaintiff was sufficiently skilled in the areas of comprehension, communication, interpretation, and analysis needed to perform the duties of her role in a professional and satisfactory manner.

93.     Further, Plaintiff performed her job duties in a satisfactory manner.

94.     Despite these qualifications, on October 18, 2025, Defendants, through Ms. Maring, terminated Plaintiff.

12

**C.      The Adverse Employment Action Was the Result of Intentional Discrimination.**

95.      At all times relevant herein, Ms. Maring possessed the authority to terminate Plaintiff.

96.      Upon information and belief, Ms. Maring was the only agent of RPL who provided input in the decision to terminate Plaintiff.

97.      Plaintiff's similarly situated and male colleague, SF, performed the same workplace duties in the same manner as Plaintiff.

98.      However, SF was not terminated.

99.      Correspondingly, Defendants' decision to terminate Plaintiff and not SF raises a sustainable inference of discrimination due to Plaintiff's sex.

100.      At all times relevant herein, Defendants acted with reckless indifference and/or malice in regard to Plaintiff's federally protected rights which warrants the recovery of punitive damages.

101.      As a direct and proximate result of Defendants' conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

102.      WHEREFORE, Plaintiff, SM, a minor, By Rebecca Mack, Guardian, seeks the damages set forth in the *ad damnum* clause of this Complaint in Civil Action, *infra*.

## JURY DEMAND

103.      Plaintiff demands a trial by jury on all matters so triable.

### *AD DAMNUM* CLAUSE

104.    For the above stated reasons, Plaintiff, SM, a Minor, by Rebecca Mack, Guardian, respectfully requests the United States District Court for the Middle District of Pennsylvania to enter judgment in her favor, and against Defendants, Ripleighs LLC and Laura Maring, and prays for relief as follows:

   a.  Declare and find that Defendants committed one or more of the following acts:

      i.    Violated Title VII and the PHRA in terminating Plaintiff because of her protected activities; and

      ii.   Violated Title VII and the PHRA in terminating Plaintiff because of her sex.

   b.  Award equitable relief in the form of back pay and front pay;

   c.  Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

   d.  Award punitive damages to Plaintiff in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature;

   e.  Award pre-judgment and post-judgment interest where accorded by law;

   f.  Award reasonable attorney's fees and costs of suit;

   g.  Award injunctive and other equitable relief as provided by law; and

   h.  Award such other and further relief as the EEOC deems just, equitable, and proper.

Date: July 27, 2026                           Respectfully submitted,

                                              **STEENLAND LAW, PLLC**

                                              By: */s/ Kyle H. Steenland*
                                              Kyle H. Steenland (Pa Bar No. 327786)

                                              Steenland Law, PLLC
                                              1575 McFarland Road, Suite 212
                                              Pittsburgh, PA 15216
                                              Phone: 412.368.2324
                                              Fax: 412.214.9182
                                              E-mail: kyle@steenlandlaw.com

                                              *Counsel for Plaintiff,*
                                              *SM, a Minor, by Rebecca Mack,*
                                              *Guardian*

**VERIFICATION**

I, Rebecca Mack, as Guardian and on behalf of SM, a minor, have read the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief.  I understand that this verification is made subject to the penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: _____

*Rebecca E Mack*
ID fuBZN4L6qnXpULNL4pjvcf44

Rebecca Mack, as Guardian and
on behalf of SM, a minor